UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HANNAH BROTHERS,

                Plaintiff,

- against -

OSK MARKETING & COMMUNICATIONS, INC.,

OSK PROJEKTMANAGEMANT,

OLIVER SCHROTT KOMMUNIKATION GMBH,

SIEMENS AKTIENGESELLSCHAFT, &

SIEMENS ENERGY & AUTOMATION, INC.,

                Defendants.

1:09-cv-00654-RJH

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

      The question in this maritime attachment proceeding is whether the plaintiff may effectively pierce the corporate veil of a contractual counterparty by alleging that the defendants entered into an unwritten "maritime joint venture." Since the complaint here does not plausibly allege the existence of such a joint venture, the Court rejects plaintiff's novel theory of enterprise liability and vacates its prior attachment orders. In addition, the Court grants in part and denies in part a request for attorneys' fees, interest, and costs by defendant Siemens A.G.

**I.     BACKGROUND**

This dispute involves six corporate entities involved in the aborted North American tour of the "Exiderdome," a floating exhibition of automation technology.[1] Plaintiff Hannah Brothers ("Hannah") is an Illinois partnership, which is engaged in the maritime trade. Defendants are German companies or their U.S. affiliates. Siemens A.G. ("Siemens") is a large German conglomerate. Siemens Energy & Automation, Inc. is a U.S. affiliate of Siemens A.G. Oliver Schrott Kommunikation GmbH ("OSK") is a large German public relations firm. OSK Projektmanagemant ("OSK PM") is a German affiliate of OSK. OSK Marketing & Communications, Inc. ("OSK Marketing"), a Delaware corporation that is headquartered in New York City, is a U.S. affiliate of OSK. (*See* Compl. ¶¶ 3-7 & Ex. 1.)

**A.     The Exiderdome Tour**

On March 3, 2008, an affiliate of Hannah, Hannah Marine Corp., entered into a Bareboat Charter Agreement (the "Bareboat Charter") with OSK Marketing. (*See* Compl. Ex. 1.) Under the charter, Hannah Marine agreed to provide OSK Marketing with an all-steel deck barge, the "Exiderdome 1," for an indefinite period beginning on June 26, 2008. (Bareboat Charter ¶ 4.) In exchange, OSK Marketing agreed to pay Hannah Marine $2,500 per day. (*Id.* ¶ 4(a).) The parties later amended the charter to substitute Hannah for Hannah Marine Corp. (*See* Amendment to Bareboat Charter Agreement, Compl. Ex. 1.) Aside from OSK Marketing, none of the defendants named in this action is a party to the charter.

---

[1] "Exiderdome," a made up German-English word, is not capitalized consistently in the record. For the sake of consistency, the Court adopts the capitalization used in the complaint.

- 2 -

After the charter was executed, the Exiderdome 1 was outfitted with the Exiderdome exhibition at the Ironhead Shipyard in Toledo, Ohio. (Compl. ¶ 8.) The "Exiderdome" is a modular exhibition hall, which has traveled throughout the world by various means of transport. (*See* Hannah Decl. Ex. 8.) It provides visitors with the opportunity to experience the latest in automation technology, as well as a forum for exchanging ideas about business opportunities. (*See* Siemens Announces U.S. Tour of exiderdome, http://www2.sea.siemens.com/News/Corporate/exiderdome-announcement.htm (last visited Apr. 7, 2009).) The exhibition consists of multiple shipping containers, which are arranged in a two-story structure that is about fifty feet long. (*Id.*)

After visiting several North American cities, the floating Exiderdome arrived at Pier 90 in New York City on November 3, 2008. (Compl. ¶¶ 10, 13.) On November 7, 2008, Hannah apparently learned that defendants were planning to send the Exiderdome to Albany, New York without a working anchor. (*See id.* ¶¶ 12-13.) Hannah maintains that defendants thus breached the Bareboat Charter, which in turn entitled it to immediately repossess the Exiderdome 1. (Compl. ¶ 12; *see* Bareboat Charter ¶¶ 15(a)(iv) and 15(b) (providing that "putting the Vessel in an un-seaworthy condition" constitutes a non-curable breach of the charter).)

At some point on Friday, November 7, Hannah informed defendants that the Exiderdome 1 could not leave Pier 90 without a working anchor. (Compl. ¶ 12.) Defendants responded by booking a "renegade" tug—one Hannah had not approved of—to pull the barge to Albany. (*Id.* ¶ 13.) At about 1:00 a.m. on Saturday, November 8, Hannah reiterated to defendants that the Exiderdome 1 was not allowed to make any

voyages without a working anchor. (*Id.* ¶ 16.) Defendants, however, continued to take steps to mobilize the barge using their "renegade" tug. (*Id.*)

What happened next is not entirely clear, but at some point Hannah repossessed the barge and towed it to Brooklyn. (*Id.* ¶ 18.) Hannah eventually towed the barge to New Jersey, where it was arrested by the Ironhead Shipyard. The barge remains there to this day, the subject of ongoing disputes between the parties to this action and the Ironhead Shipyard. (*See* Tr. of Oral Arg. 4, Apr. 3, 2009; Compl., *Hannah Brothers v. OSK Marketing & Communications, Inc.*, No. 08 Civ. 6164 (WJM) (MF) (D.N.J. Dec. 17, 2008).)

**B.    Procedural History**

The November 2008 dispute over control of the Exiderdome 1 provoked a flurry of legal activity. On November 9, 2008, Hannah sent defendants notice of its intent to arbitrate certain contractual disputes under paragraph 24 of the Bareboat Charter. (Compl. Ex. 5.) Three days later, all but one of the defendants in this action filed suit against Hannah in this Court, seeking to enjoin Hannah from terminating the charter, interfering with the Exiderdome 1, or repossessing the barge. (*See* Compl., *OSK Marketing & Communications, Inc. v. Hannah Brothers*, No. 08 Civ. 9734 (RJS) (S.D.N.Y. Nov. 12, 2008), Wilson Aff. Ex. A.) For reasons that are not clear from the current record, that action was voluntarily dismissed on January 15, 2009.

Seven days later, on January 22, 2009, Hannah filed this action. In its complaint, Hannah alleged that OSK Marketing breached the Bareboat Charter. (*See* Compl. ¶¶ 17-22.) The complaint additionally alleged that OSK, OSK PM, and Siemens were jointly and severally liable for OSK Marketing's breach of the Bareboat Charter by virtue of

their participation in a "maritime joint venture" with OSK Marketing.  (*See id.* ¶ 30.)  As already noted, OSK, OSK PM, and Siemens are not parties to the Bareboat Charter.

The complaint cited several facts in support of its joint venture theory.  With respect to OSK, the complaint noted that (i) OSK owned the modular components that served as the building and infrastructure for the Exiderdome (*id.* ¶ 37), and (ii) OSK, without consideration, provided $999,000 to OSK PM, which OSK PM later used to prepay hire for the Exiderdome 1 (*id.* ¶ 38).  As for OSK PM, the Complaint noted that (i) OSK PM entered into a mortgage agreement with Hannah whereby OSK PM advanced $999,000 to Hannah as pre-paid hire that Hannah used to purchase the Exiderdome 1 (*id.* ¶ 35), and (ii) the agreement was entered into with the express purpose of procuring and arranging for the waterborne transportation of the Exiderdome (*id.*).  Finally with respect to Siemens, the complaint noted that (i) Siemens has a lease interest in the Exiderdome (*id.* ¶ 39), (ii) Siemens is the owner of certain equipment displayed in the Exiderdome (*id.*), and (iii) Siemens was authorized to approve ports where Exiderdome 1 put in (*id.* ¶ 41).  All of the defendants, the complaint alleged, were "integral" participants in the Exiderdome tour.  (*See id.* ¶¶ 35-40.)

On January 26, 2009, the Court authorized process of maritime attachment and garnishment as to OSK and OSK PM.  After receiving additional submissions concerning Siemens' lack of presence in the Southern District of New York, the Court authorized process of maritime attachment and garnishment as to Siemens on February 9, 2009.  Hannah did not seek, nor did the Court order, process of maritime attachment as to OSK Marketing or Siemens Energy & Automation, Inc., both of whom are "present" in the Southern District of New York within the meaning of *Seawind Compania, S. A. v.*

- 5 -

*Crescent Line, Inc.*, 320 F.2d 580 (2d Cir. 1963).  The parties report that approximately $4,100,000 has been restrained pursuant to the Court's orders.

On March 24, 2009, OSK, OSK PM, and Siemens (collectively, the "moving defendants") moved to vacate the Court's attachment orders.  Moving defendants contend that although they unquestionably were involved in the Exiderdome tour, they never entered into a joint venture with OSK Marketing.  Arguing that Hannah's joint venture theory is nothing more than "a clumsy lunge for a deep pocket" (Siemens Mem. 14), Siemens additionally requests that attorneys' fees, costs, and interest on its restrained funds be assessed against Hannah (*id.* at 16-17).  Hannah contends it has made a sufficient showing that moving defendants entered into a joint venture with OSK Marketing.  (Hannah Mem. 20-24.)  Relying on the strength of its position on the merits, Hannah did not respond to Siemens' request for attorneys' fees, costs, and interest.  At oral argument, Hannah reiterated that its only basis for attaching moving defendants' assets is their alleged participation in a maritime joint venture with OSK Marketing.  (Tr. of Oral Arg. 14.)

## II.  DISCUSSION

The Court first considers whether its prior orders of attachment and garnishment should be vacated, then turns to Siemens' request for attorneys' fees, costs, and interest.

### A.  Vacatur

#### 1.  General Standards

In a proceeding under Supplemental Admiralty Rule E of the Federal Rules of Civil Procedure, "a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of [Supplemental Admiralty] Rules B and E."  *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445

(2d Cir. 2006). Among other things, Rule B requires a plaintiff to show he has "a valid prima facie admiralty claim" against a defendant whose assets he seeks to restrain. *Id.* at 445.

Here the question is whether Hannah has made a sufficient showing that moving defendants entered into a "maritime joint venture" with OSK Marketing. Only OSK Marketing is a signatory to the contract Hannah's claim is based on. And in admiralty, as elsewhere, courts will respect the corporate form absent a showing that doing so would further a fraud or otherwise be inequitable. *See Williamson v. Recovery Ltd. Partnership*, 542 F.3d 43, 53 (2d Cir. 2008).

Hannah contends that in determining whether moving defendants entered into a joint venture with OSK Marketing, the Court should look exclusively to the complaint, and apply the general pleading standard of Federal Rule of Civil Procedure 8(a). Hannah Mem. 11; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding that to state a claim, a pleader must allege "enough facts to state a claim to relief that is plausible on its face"); *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (holding that *Twombly*'s "flexible 'plausibility standard,' . . . obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*"), *cert. granted sub nom. Ashcroft v. Iqbal*, 128 S. Ct. 2931 (2008). While this understanding of Rule B is not uncontroversial, *compare Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06 CV 1979 (KMW), 2006 U.S. Dist. LEXIS 95870, at *15 (S.D.N.Y. 2006) (Wood, J.), *with Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006) (Lynch, J.), there is no need to take up the question of what showing is necessary to establish "a valid prima facie

admiralty claim" here. For, even under Hannah's preferred standard, the Court's prior orders must be vacated.

### 2. Joint Venture—Definition and Elements

A joint venture is "[a] business undertaking by two or more persons engaged in a single defined project." *Black's Law Dictionary* 843 (7th ed. 1999) ("*Black's*"). A joint venture is a *contractual* undertaking: "Joint venture status is created by contract, express or implied, and depends on the mutual intent of the parties." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 512 (2d Cir. 2004) (applying New Jersey law). *See, e.g.*, *Dime Box Petroleum Corp. v. Louisiana Land and Exploration Co.*, 938 F.2d 1144, 1147 (10th Cir. 1991) (applying Colorado law); *Pinnacle Port Cmty. Ass'n, Inc. v. Orenstein*, 872 F.2d 1536 (11th Cir. 1989) (applying Florida law); *Claudio v. United States*, 907 F. Supp. 581, 586 (E.D.N.Y. 1997) (applying general common law).

While the law is not entirely consistent from jurisdiction to jurisdiction, *see Black's*, at 843 (citing Henry G. Henn & John R. Alexander, *Laws of Corporations* § 49, at 106 (3d ed. 1983)), five factors generally determine whether two or more persons have entered into a joint venture. They are:

    (i)    whether the putative joint venturers entered into a specific agreement to carry on an enterprise for profit;

    (ii)    whether their agreement evidenced an intent to be joint venturers;

    (iii)    whether each putative joint venturer made a contribution of property, financing, skill, knowledge, or effort to the alleged joint venture;

    (iv)    whether each putative joint venturer exercised some degree of control over the venture; and

    (v)    whether the putative joint venturers agreed to share the profits and losses of the venture.

*See Toporoff Eng'rs, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105 (2d Cir. 2004) (applying New York law); *Trustmark Ins. Co. v. General & Cologne Life Re of America*, 424 F.3d 542 (7th Cir. 2005) (applying Illinois law); *see generally* 46 Am. Jur. 2d *Joint Ventures* §§ 8, 11, at 31-32, 35-37 (2006) (listing alternative formulations).

Hannah contends, and the Court assumes for the sake of argument, that "federal maritime courts . . . look to the 'totality of the circumstances and/or the 'whole relationship' between the alleged joint venturers to determine whether a joint venture exists." (Hannah Br. 18 (citing *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 211 (11th Cir. 1991), and *Cashman Equip. Corp. v. Trans Caribbean Transp. Co.*, No. 96-3116, 1996 WL 626294 (E.D. La. Oct. 29, 1996).) Thus, the Court assumes that no one factor is dispositive of whether moving defendants entered into a joint venture with OSK Marketing.

### 3. The Complaint's Joint Venture Allegations

The complaint does not plausibly allege that the moving defendants entered into a joint venture with OSK Marketing. First, the complaint does not allege that moving defendants ever entered into an *agreement* with OSK Marketing. The only agreements referenced in the complaint are the Bareboat Charter (Compl. Ex. 1), a mortgage agreement entered into by OSK PM and Hannah (*see* Compl. ¶ 35), and a lease entered into by Siemens and OSK (*see id.* ¶ 39). These agreements, which are entirely separate, do not transform moving defendants into joint venturers. *Cf. Haas v. 653 Leasing Co.*, 425 F. Supp. 1305, 1316 (E. D. Pa. 1977) (Becker, J.) ("None of the distinguishing characteristics of a joint venture are present in the general contractor-subcontractor relationship." (footnote omitted)).

Second, assuming that moving defendants entered into an agreement with OSK Marketing, the complaint does not plausibly allege that the object of the agreement was a *joint venture*. The only references to the moving defendants' intentions in the complaint come in paragraphs 32 and 35. Paragraph 32, however, is little more than an incomplete recitation of the elements of a joint venture, and thus immaterial to the present analysis. *Twombly*, 550 U.S. at 555 ("While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (citations omitted)). And paragraph 35 only alleges that OSK PM intended to arrange water-borne transportation for the Exiderdome; it says nothing about OSK PM's intent to enter into a joint venture.

Third, the complaint does not plausibly allege that OSK Marketing and the moving defendants agreed to share profits and losses, another critical ingredient of a joint venture. *See, e.g.*, *Brown v. Cara*, 420 F.3d 148, 160 (2d Cir. 2005) (applying New York law)); *Geneva Pharms.*, 386 F.3d at 512 (applying New Jersey law). At oral argument, Hannah suggested that because the Exiderdome tour was not intended to generate an economic profit, the Court should look to other potential benefits, such as whether the moving defendants enjoyed increased exposure to the U.S. market. (Tr. of Oral Arg. 11-12.) Hannah's proposed rule, however, would transform the parties to every supply contract into joint venturers. And in any event, one would expect that defendants would have made some provision for the apportionment of losses if they entered into a joint venture with one another. On this point, the complaint is silent. While it recites that OSK provided $999,000 to OSK PM, which OSK PM paid over to Hannah for hire of the

Exiderdome 1 (Compl. ¶ 38), the complaint never alleges that moving defendants and OSK Marketing made an arrangement for apportioning losses from the Exiderdome tour.

With this in mind, the remaining evidence cited by Hannah in support of its joint venture theory is easily dismissed. That the defendants "have been represented by the same counsel and have . . . answered as one voice" (*id.* ¶ 31) might, in appropriate circumstances, indicate a disregard for the corporate form supporting "alter ego" liability. *Cf. Williamson*, 542 F.3d at 53. But on their own, such actions hardly support a plausible inference that defendants affirmatively agreed to enter into a joint venture. Likewise for OSK's and OSK PM's pre-payment payment of hire to Hannah. (*See* Compl. ¶¶ 35, 38.) While OSK and OSK PM's payments conceivably indicate that the OSK defendants intermingled funds, they hardly show that OSK PM and OSK Marketing affirmatively intended to enter into a joint venture. *Cf. Secon Serv. System, Inc. v. St. Joseph Bank and Trust Co.*, 855 F.2d 406, 417 (7th Cir. 1988) ("A creditor who contributes capital and secures his contribution with a note can be a joint venturer, but only '[w]here it is the intent of the parties for all co-venturers to be subject to the risks of the business'." ) (applying Indiana law)). Lastly, that Siemens owned the technology showcased in the Exiderdome is unexceptional. Just as a loan does not spontaneously transform the lender and borrower into joint venturers, *see Atlanta Shipping Corp., Inc. v. Chem. Bank*, 631 F. Supp. 335, 351 (S.D.N.Y. 1986) (Goettel, J.), *aff'd*, 818 F.2d 240 (2d Cir. 1987), so delivering property to another does not, in the absence of an agreement to form a joint venture, transform the bailor and bailee into joint venturers.

In short, perhaps on an exceedingly generous reading, Hannah's complaint could be read to support the conclusion that OSK, OSK PM, and OSK Marketing's actions

reflect a disregard for the corporate form that justifies holding those entities jointly liable as alter egos.[2] Hannah does not rely on that theory, however (Tr. of Oral Arg. 14); and the allegations of the complaint are wholly inadequate to support the theory Hannah *does* rely on—that moving defendants entered into a joint venture with OSK Marketing. Accordingly, the Court's prior orders of attachment and garnishment are vacated.

**B.     Attorneys' Fees, Costs, and Interest**

Suggesting that Hannah acted with an improper motive in obtaining the prior orders of attachment, Siemens contends that attorneys' fees, costs, and interest on its restrained funds should assessed against Hannah. In particular, Siemens contends that,

> This case is an extreme example of the current "Rule B gone wild" craze in which maritime attachments are obtained in order to bludgeon settlements from foreign entities often based on the flimsiest of "joint venture" or "alter ego" liability allegations, with plaintiffs trusting that the Court will refrain from inspecting too closely the merits of the allegations on a post-attachment hearing.

(Siemens Mem. 16-17.)

With a somewhat finer point, it might be argued that Hannah should be sanctioned for purposefully disregarding the parties' ex ante allocation of the risks of the Exiderdome tour. Hannah negotiated the terms of the charter with moving defendants and OSK Marketing. If OSK Marketing (which apparently is thinly capitalized) was an unsuitable counterparty, Hannah was free to negotiate guarantees from moving defendants. *See Secon*, 885 F.2d at 413-14; *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979).

---

[2] If this were the case, plaintiff would not be entitled to attach any of the OSK defendants' assets. As this Court has previously held, a Rule B plaintiff may not simultaneously contend that two parties are alter egos, and that one but not the other face of the unitary business is present in the district. *Glory Wealth Shipping Pte Ltd. v. Industrial Carriers, Inc.*, 590 F. Supp. 2d 562 (S.D.N.Y. 2008) (Holwell, J.).

The only authority Siemens cites, however, is *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329 (2d Cir. 1986). There, the Second Circuit applied the familiar "American rule" for attorneys' fees: while the prevailing party is not entitled to attorneys' fees as of right, "the court does have the power to award attorneys' fees to a successful litigant when his opponent has commenced or conducted an action 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 344. Under the rule's "bad faith" exception, attorneys' fees may only be awarded if a court makes specific factual findings as to a litigant's bad faith, and "the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes." *Id.* (alterations and internal quotation marks omitted).

Although there is some merit to the argument that Hannah cannot in good faith "bludgeon" guarantees from moving defendants after the fact, an award of attorneys' fees and interest is not appropriate here. For one thing, the Court shares responsibility for the wrongful attachment of Siemens' assets. As the discussion above makes clear, Hannah's joint venture theory was flawed from the beginning. *See supra* Part II.A.3. The Court ought to have recognized this and denied an attachment in the first instance.

More significantly, the kind of actions that Siemens complains about are a natural consequence of the Second Circuit's expansive interpretation of Rule B. Rule B does not call for a rigorous showing. *See* 1985 Advisory Committee Note to Supp. Rule B, 28 U.S.C.A. Rule B, at 490 (2008) ("The rule envisions that the order [of attachment and garnishment] will issue when the plaintiff makes a prima facie showing that he has a maritime claim against the defendant in the amount sued for and the defendant is not present in the district."); *see also id.* at 490-91 (noting that "[t]he reference to review by

the 'court' is broad enough to embrace review by a magistrate," and that an order may be obtained from the Clerk of Court in exigent circumstances).  Combined with the Second Circuit's holdings that virtually any property connected to the defendant is subject to attachment, *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 276 (2d Cir. 2002), and that an issuing court may not weigh the equities before authorizing attachment, *Aqua Stoli*, 460 F.3d at 447, the Rule is an invitation to strategic abuse.  Because a dollar now is worth more than a dollar in the future, *see, e.g.*, Richard A. Brealey et al., *Principles of Corporate Finance* 14 (9th ed. 2008), any litigant who can satisfy the lightweight requirement of showing a "prima facie admiralty claim" may impose a tax on his adversary equal to the time value of money for the duration of litigation.  And because a lawsuit's settlement value includes the costs of litigation, *see, e.g.*, George L. Priest & Benjamin Klein, *The Selection of Disputes for Litigation*, 13 J. Legal Stud. 1, 12 (1984), it would be economically irrational, all other things being equal, for a party *not* to attach his adversary's assets via Rule B.  While the merits of this scheme could reasonably be questioned, the Court can hardly fault a litigant for taking advantage of it—at least where, as here, the litigant fully discloses the facts supporting an attachment, inadequate though they may be.  *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 371 (2d Cir. 1995) ("A claimant's motive in filing an attachment is irrelevant . . . .").  Accordingly, Siemens' request for attorneys' fees and interest is denied.[3]

---

[3] The discussion above should not be read to hold that a serial Rule B abuser is beyond sanction.  In the Court's view, a showing that a litigant has repeatedly obtained wrongful Rule B attachments would be highly relevant to whether the litigant, in a particular case, acted "in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Dow Chem.*, 782 F.2d at 344.  However, no such showing has been made here.

The discussion above also underscores a point that has become conventional wisdom in this district—that *Winter Storm* and *Aqua Stoli* may merit reconsideration by

the United States Supreme Court or the en banc Second Circuit. Beyond the issues noted above, both decisions are in substantial tension with other decisions of the courts of appeals and the Supreme Court. *Winter Storm*, for instance, expressly declined to adopt § 4A-503 of the Uniform Commercial Code as a federal rule of decision, notwithstanding the federal courts' longstanding recognition that adopting a state rule of decision may be especially appropriate if "a decision . . . contrary to the general rule of the state might have disruptive consequences for the state banking system." *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 52-53 (2d Cir. 1965). *See, e.g.*, *Union Planters Nat'l Bank v. World Energy Sys. Assocs.*, 816 F.2d 1092, 1098 (6th Cir. 1987) (adopting and applying this rationale); *Reibor Int'l Ltd. v. Cargo Carriers (KACZ-CO.) Ltd.*, 759 F.2d 262, 266 (2d Cir. 1985) (same).

  *Winter Storm* is also difficult to reconcile with the Supreme Court's established methodology for defining what interests create property rights under federal law. Interpreting the Due Process Clause of the Fourteenth Amendment, the Court has held that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). *See, e.g.*, *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *Butner v. United States*, 440 U.S. 48, 55 (1979) (same). Applying this methodology, the Court has held that a bank account (much less an electronic funds transfer) does not create a property interest, but is "nothing more or less than a promise to pay, from the bank to the depositor . . . ." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995); *see Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.").

  Notably, *Winter Storm* did not attempt to identify any existing rule or understanding (and the Court is aware of none) that defined the scope of "property" subject to attachment under Rule B, nor did it consider the Supreme Court's holdings in *Strumpf* or *Bank of Marin*. Instead, relying on a drug-forfeiture case, 310 F.3d at 276-78, the Nicene Creed, *id.* at 276 n.9, and the policy of liberal attachment in maritime proceedings, *id.* at 268, *Winter Storm* found an electronic funds transfer sufficiently "property-like" to be subject to attachment. *See id.* at 276-78.

  *Aqua Stoli*, on the other hand, held that the Supplemental Rules for Certain Admiralty and Maritime Claims provide the exclusive source of admiralty procedure. *See Aqua Stoli*, 460 F.3d 434 at 447 ("Rule B specifies the sum total of what must be shown for a valid maritime attachment."). That holding directly conflicts with an en banc decision of the United States Court of Appeals for the Eleventh Circuit, *see Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion*, 773 F.2d 1528, 1533 (11th Cir. 1985) (en banc) ("Clearly, [the supplemental admiralty] rules were not intended to be the exclusive source of maritime procedure available to the courts . . . ."), as well as with the views of the Advisory Committee on Admiralty Rules, *see* 1966 Advisory Committee Note to Supp. Rule A, 28 U.S.C.A. Rule A, at 483 (2008) ("No attempt is here made to compile a complete and self-contained code governing these distinctively maritime remedies.").

Nevertheless, the costs of this proceeding will be assessed against Hannah. Federal Rule of Civil Procedure 56(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." "In keeping with the discretionary character of the rule, the federal courts are free to pursue a case-by-case approach and to make their decisions on the basis of the circumstances and equities of each case." 10 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2668, at 231 (3d ed. 1998). The Court is unaware of any federal statute or rule that precludes an award of costs in a proceeding under Supplemental Admiralty Rule E; and the weakness of Hannah's joint-venture showing, together with the element of overreaching discernable in Hannah's decision to bring this attachment proceeding, support an award of costs.

---

Aside from creating conflicts in circuit law, *Winter Storm* and *Aqua Stoli* have led to the filing of Rule B cases, many of questionable merit, "by the hundreds." *Korea Line Plaintiff and Defendant in Rule B Cases*, Lloyd's List, Jan. 13, 2009, at 3. *See Swiss Marine Services S.A. v. Louis Dreyfus Energy Services L.P.*, 598 F. Supp. 2d 414, 415 (S.D.N.Y. 2008) (Sand, J.). While the surge of filings says little about whether *Winter Storm* and *Aqua Stoli* were correctly decided, it does suggest that those decisions may have had unintended practical consequences. In this respect, the Circuit's recent suggestion that *Congress* is responsible for correcting the errors (if any) in *Winter Storm* and *Aqua Stoli*, and that *Winter Storm* is entitled to deference as a matter of *stare decisis*, is puzzling. *See Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 109 (2d Cir. 2008). Pursuant to Article III's grant of jurisdiction, the federal courts have long exercised common law authority to formulate and revise rules of decision in the admiralty field. *See* Robert Force, *Admiralty and Maritime Law* 21 (2004). And *stare decisis* recognizes that "[r]evisiting precedent is particularly appropriate where . . . a departure would not upset expectations, the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent's shortcomings." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009).

In short, *Winter Storm* and *Aqua Stoli* have (i) created conflicts in circuit law in an area where national uniformity is critical, and (ii) been called into doubt by events that may not have been foreseeable at the time they were originally decided. In such circumstances, revisiting prior decisions is not an unjustified strain on already overburdened judicial resources, *cf.* Jon O. Newman, *In Banc Practice in the Second Circuit: The Virtues of Restraint*, 50 Brook. L. Rev. 365, 382 (1984), but a traditional judicial duty.

### III. CONCLUSION

The Court's prior orders of attachment [3] [6] are vacated. Hannah is directed to release any of defendants' funds attached under authority of the Court's prior orders and to reimburse Siemens for costs incurred in this proceeding. Siemens' request for sanctions is otherwise denied.

SO ORDERED.

Dated: New York, New York
April 24, 2009

Richard J. Holwell
United States District Judge